UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                              Case No. 20-49216

JASON ROBERT WYLIE, and                             Chapter 7
LEAH S. WYLIE,
                                                    Judge Thomas J. Tucker
            Debtors.
_____/

TIMOTHY J. MILLER, TRUSTEE,

      Plaintiff,

v.                                                  Adv. Pro. No. 21-4012

JASON ROBERT WYLIE,

and

LEAH S. WYLIE,

      Defendants.
_____/

**POST-TRIAL OPINION**

## I. Introduction

      This adversary proceeding concerns objections to discharge.  The Defendants, Jason

Wylie and Leah Wylie, are husband and wife.  They filed a joint Chapter 7 bankruptcy case on

August 27, 2020.  The Plaintiff Timothy J. Miller, Chapter 7 Trustee, seeks a judgment denying

each of the Defendants a discharge, based on 11 U.S.C. §§ 727(a)(2)(A), 727(a)(2)(B), and

727(a)(4)(A) (Counts I, II, and III of Plaintiff's First Amended Complaint).[1]

_____

[1] Plaintiff's First Amended Complaint (Docket # 10) contained ten counts.  On the first day of
trial, the Court entered orders dismissing Counts IV through X, and part of Count III.  *See* "Order
Dismissing Certain Claims in Plaintiff's First Amended Complaint, with Prejudice, as Untimely" (Docket
# 100); "Order Dismissing Certain Claims in Plaintiff's First Amended Complaint, Without Prejudice, as
Moot" (Docket # 101).  This leaves only Counts I, II, and part of Count III pending.

The Court held a bench trial over a four day period.[2]  The Court has considered all of the evidence and arguments presented by the parties.  This includes the testimony of all the witnesses — namely, Steven Eshelman; Defendant Jason Wylie; Defendant Leah Wylie; attorney Jeffrey Bigelman; and attorney Thomas Morris.  And this includes all of the exhibits, or parts of exhibits, that were admitted into evidence.[3]  This Opinion states the Court's findings of fact and conclusions of law.

For the reasons stated below, the Court finds for the Defendant Debtors on Counts I and III of the First Amended Complaint, and will dismiss those counts with prejudice.  The Court finds for the Plaintiff Trustee on Count II of the First Amended Complaint, and will deny each of the Defendant Debtors a discharge under 11 U.S.C. § 727(b)(2)(B).  The Court will enter a judgment accordingly.

## II.  Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and E.D. Mich. L.R. 83.50(a).  Each of the Plaintiff's three remaining claims in this adversary proceeding is a core proceeding under 28 U.S.C.

---

[2]  Due to the COVID pandemic, the trial was conducted remotely, rather than in person in the courtroom.  This was done by a combination of Webex video conference and telephone.

[3]  In this Opinion, the Court will cite the trial exhibits using this format: "PX-__" for the Plaintiff's exhibits; and "DX-__" for the Defendants' exhibits.  The Plaintiff's exhibits admitted into evidence are PX-2, 3, 5, 6, 7, 8, 16, and 17-27.  All of these Plaintiff's exhibits are filed at Docket # 97.  The Court notes that PX-9 was never admitted into evidence, but there was a good deal of testimony by Steven Eshelman about that exhibit and its subject matter that was admitted into evidence.

The Defendants' exhibits admitted into evidence are DX-A (conditionally admitted, as discussed below); B, C, D, E, F, G, and H.  These Defendants' exhibits are filed at Docket ## 98, 102, and 104.  DX-A was conditionally admitted into evidence, subject to the Court's later determination as to whether it is relevant.  The Court now rules that this exhibit is relevant, and so it is now unconditionally admitted into evidence.

2

§ 157(b)(2)(J).

## III. Discussion

### A. Background and basic facts

The Trustee's objections to discharge relate to the Debtors' 2018 and 2019 federal and state income tax returns, and the Debtors' rights to tax refunds as shown by those tax returns. The following basic facts are undisputed.

#### a. The Debtors' 2018 income tax returns

The Debtors filed their joint 2018 federal income tax return and their joint 2018 Michigan income tax return on March 31, 2020[4] — *i.e.*, almost five months before the Debtors filed their bankruptcy petition on August 27, 2020. As shown on the 2018 federal return, the Debtors made federal income tax payments for 2018 that exceeded their tax liability (an "overpayment") in the amount of $21,317.00.[5] As shown on the 2018 Michigan return, the Debtors made a state income tax overpayment for 2018 in the amount of $17,956.00.[6] Thus, the Debtors had a right to receive income tax refunds for 2018 in the total amount of $39,273.00.

Instead of opting to receive these tax refunds, however, the Debtors elected to have their tax overpayments applied to their 2019 income tax liabilities. On their 2018 federal income tax return, the Debtors listed the entire $21,317.00 tax overpayment on line 21, as the amount "you

---

[4] The parties stipulated to this March 31, 2020 tax return filing date. *See* Final Pretrial Order (Docket # 94) at pdf p. 18 ¶ 4.a.i (stipulation).

[5] *See* PX-5 (excerpt of 2018 Form 1040) at pdf p. 2, line 19. A copy of the Debtors' full 2018 federal income tax return is in DX-D, at pdf pp. 5-52.

[6] *See* PX-5 (excerpt of 2018 Michigan Form MI-1040) at pdf p. 4, line 34. A copy of the Debtors' full 2018 Michigan income tax return is in DX-D, at pdf pp. 53-65.

3

want **applied to your 2019 estimated tax**."[7] On their 2018 Michigan income tax return, the Debtors listed the entire $17,956.00 tax overpayment amount on line 35, as "**Credit Forward. Amount of [tax overpayment] to be credited to your 2019 estimated tax for your 2019 tax return.**"[8]

The Trustee alleges that in making these elections within one year before filing their bankruptcy petition, to apply their 2018 tax overpayments to their 2019 income tax liabilities, the Debtors "transferred" and "concealed" their property, and that they did so "with intent to hinder, delay, or defraud a creditor," all within the meaning of 11 U.S.C. § 727(a)(2)(A). For this reason, Count I of the Trustee's First Amended Complaint seeks the denial of the Debtors' discharge.[9]

### b. The Debtors' 2019 income tax returns

The Debtors filed their joint 2019 federal income tax return and their joint 2019 Michigan income tax return on September 15, 2020[10] — *i.e.*, just under three weeks after the Debtors filed their bankruptcy petition. As shown on the 2019 federal return, the Debtors were credited with federal income tax payments for 2019 that exceeded their tax liability by the amount of $20,798.00. In calculating this 2019 tax overpayment amount, the Debtors' 2019 tax payments

---

[7] PX-5 at pdf p. 2 line 21 (emphasis in original).

[8] PX-5 at pdf p 4 line 35 (emphasis in original).

[9] First Am. Compl. (Docket # 10) at ¶¶ 31-33.

[10] The parties stipulated to this September 15, 2020 tax return filing date. *See* Final Pretrial Order (Docket # 94) at pdf p. 18 ¶ 4.a.ii (stipulation).

4

included the Debtors' $21,317.00 overpayment from 2018.[11]

As shown on the Debtors' 2019 Michigan return, the Debtors made state income tax overpayments for 2019 in the amount of $20,736.00.  In calculating this 2019 tax overpayment amount, the Debtors' 2019 tax payments included the Debtors' $17,956.00 overpayment from 2018.[12]

Thus, the Debtors had a right to receive income tax refunds for 2019 in the total amount of $41,534.00.  Instead of opting to receive these tax refunds, however, the Debtors elected to have the entire amount of their federal and state income tax overpayments applied to their 2020 income tax liabilities.  They made this election in their 2019 tax returns, in the same way they had done in their 2018 tax returns.[13]

The Trustee alleges that in making these elections after filing their bankruptcy petition, to apply their 2019 tax overpayments to their 2020 income tax liabilities, the Debtors "transferred" and "concealed" property of the bankruptcy estate, and that they did so "with intent to hinder, delay, or defraud" the Trustee, who is "an officer of the estate charged with custody of property under the Bankruptcy Code," all within the meaning of 11 U.S.C. § 727(a)(2)(B).  For this reason, Count II of the Trustee's First Amended Complaint seeks the denial of the Debtors' discharge.[14]

---

[11]  *See* PX-7 (excerpt of 2019 Form 1040) at pdf p. 2 lines 18d, 18e, 19, 20; DX-E at pdf p. 14 (2019 Schedule 3).  A copy of the Debtors' full 2019 federal income tax return is in DX-E, at pdf pp. 10-102.

[12]  *See* PX-7 (excerpt of 2019 Michigan Form MI-1040) at pdf p. 4 lines 30, 34.  A copy of the Debtors' full 2019 Michigan income tax return is in DX-E, at pdf pp. 106-121.

[13]  *See* PX-7 at pdf p. 2 line 22, pdf p. 4 line 35.

[14]  First Am. Compl. (Docket # 10) at ¶¶ 35-37.

Ultimately, in June 2021, the Trustee obtained the tax refunds at issue. The details of that recovery are stated in Part III.C.3.b of this Opinion, below.

### c. The alleged false oaths made by the Debtors

Item number 28 in Schedule A/B, filed by the Debtors with their petition on August 27, 2020,[15] required the Debtors to disclose information about tax refunds owed to them. The Debtors checked the box "Yes," that tax refunds were owed to them. The Schedule A/B form therefore required the Debtors to disclose the value of the tax refunds, and to disclose the following information: "Give specific information about them, including whether you already filed the returns and the tax years . . . ." The Debtors stated that the value of tax refunds owed to them was "Unknown."[16] The only other information the Debtors stated about tax refunds was this:

> Payment of $13,000 total, $10,000 to IRS and $3,000 to state of Michigan on October 2, 2019, towards estimated income tax liability. 2019 returns have not been filed. Payment amount was estimated to equal the tax liability. [17]

The Debtors each signed and filed with their Schedules a declaration under penalty of perjury, stating that "I have read the summary and schedules filed with this declaration and that they are true and correct."[18]

The Trustee alleges that this disclosure by the Debtors about tax refunds was false, in failing to disclose the tax overpayments for 2018 and 2019, in stating that the value of tax

---

[15] Docket # 1 in Case No. 20-49216 at pdf pp. 12, 18; PX-27 at pdf pp. 12, 18.

[16] *Id.* at pdf p. 18.

[17] *Id.*

[18] *Id.* at pdf p. 54.

6

refunds owed to the Debtors was "Unknown," and in stating that the "Payment amount was estimated to equal the tax liability." The Trustee also alleges that the Debtors repeated these false statements on October 21, 2020, when they testified under oath at the § 341 first meeting of creditors that their Schedules were "truthful, accurate, and complete."[19]

In these ways, the Trustee alleges that the Debtors each "made a false oath or account," and they did so "knowingly and fraudulently," all within the meaning of 11 U.S.C. § 727(a)(4)(A). For this reason, Count III of the Trustee's First Amended Complaint seeks the denial of the Debtors' discharge.[20]

## B. Applicable law

Much of the law applicable to this adversary proceeding was discussed in the Court's opinion in a prior case, *Wise v. Wise* (*In re Wise*), 590 B.R. 401 (Bankr. E.D. Mich. 2018). The Court will quote at length from the *Wise* opinion, and the Court reiterates and adopts in this case what it stated in the quoted material.

Initially, the Court notes the following general principles:

---

[19] *See* Tr. of First Meeting of Creditors (PX-1) at 5-6 (testimony of each of the Debtors). The exhibit just cited, PX-1 was not admitted into evidence at trial. But the Court will cite and quote from that exhibit in this Opinion, because during trial both parties cited it, relied on, and asked questions about it. This occurred during the second day of trial, during the Debtors' attorney's questioning of the Trustee's attorney, Jeffrey Bigelman, as part of the Debtors' case in chief. It also occurred during the fourth day of trial, during the closing argument of the Debtors' attorney, and during the rebuttal closing argument of the Trustee's attorney.

[20] First Am. Compl. (Docket # 10) at ¶¶ 40-41, 45. Count III of the Trustee's First Amended Complaint alleged other false oaths, in addition to the false oaths described above, but to that extent Count III was dismissed by the Court's Order filed on January 11, 2022. *See* "Order Dismissing Certain Claims in Plaintiff's First Amended Complaint, with Prejudice, as Untimely" (Docket # 100); *see also* "Order Granting in Part, and Denying in Part, Defendants' Amended Motion in Limine, and Regarding Dismissal at Trial of Certain Claims in Plaintiff's First Amended Complaint as Untimely" (Docket # 90) at ¶¶ 1(b), 1(c), 3.

Section 727(a) of the Bankruptcy Code contains twelve enumerated grounds for denying the debtor a discharge. *See* 11 U.S.C. §§ 727(a)(1)-727(a)(12). For the Court to deny the debtor a discharge under any one of these grounds, the party objecting to the discharge must prove all of the elements of such ground by a preponderance of the evidence. *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir. 2000). "'Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's fresh start policy.' However, 'the very purpose of certain sections of the law, like [§ 727(a) ], is to make certain that those who seek the shelter of the [B]ankruptcy [C]ode do not play fast and loose with their assets or with the reality of their affairs.'" *Robin Singh Educ. Servs., Inc. v. McCarthy (In re McCarthy)*, 488 B.R. 814, 825 (B.A.P. 1st Cir. 2013) (citing *Palmacci v. Umpierrez (In re Umpierrez)*, 121 F.3d 781, 786 (1st Cir.1997) (internal quotation marks and citations omitted)).

*Wise*, 590 B.R. at 429.

### 1. Bankruptcy Code §§ 727(a)(2)(A) and 727(a)(2)(B)

Section 727(a)(2) of the Bankruptcy Code states:

> (a) The court shall grant the debtor a discharge, unless–
> . . . .
>
> > (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–
> >
> > > (A) property of the debtor, within one year before the date of the filing of the petition; or
> > >
> > > (B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2).

In *Wise*, the Court noted the following about § 727(a)(2)(A), much of which also applies to § 727(a)(2)(B):

"This section encompasses two elements: 1) a disposition of property, such as concealment, [transfer, removal, destruction, or mutilation,] and 2) 'a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act disposing of the property.'" *Keeney*, 227 F.3d at 683 (quoting *Hughes v. Lawson* (*In re Lawson*), 122 F.3d 1237, 1240 (9th Cir. 1997)). . . .

> [P]roof of harm is not a required element of a cause of action under Section 727. . . . [A] fair reading of the statute makes it clear that so long as there is an *intent* to hinder, delay, or defraud, in combination with an act such as a transfer, then a debtor should be denied the privilege of discharge. The statute does not provide that the creditors must have, in fact, been hindered, delayed or defrauded.

*Smiley v. First Nat'l Bank of Belleville* (*In re Smiley*), 864 F.2d 562, 569 (7th Cir. 1989) (citations omitted) (italics in original).

*Wise*, 590 B.R. at 429-30.

The Plaintiff must prove that the Debtor "transferred, removed, destroyed, mutilated, or concealed" property of the Debtor within one year of the bankruptcy, § 727(a)(2)(A), or property of the bankruptcy estate after the date of the bankruptcy petition, § 727(a)(2)(B), or that the Debtor has "permitted [such property] to be transferred, removed, destroyed, mutilated, or concealed." *See* 11 U.S.C. § 727(a)(2). In *Wise*, this Court discussed the concepts of "concealment" and "transfer" under this statute:

> **a. "Concealment"**
>
> . . .
>
> Concealment includes overt acts of disguise and "other conduct, such as placing assets beyond the reach of the creditors or withholding knowledge of the assets by failure to divulge owed information." 6 Collier on Bankruptcy ¶ 727.02[6][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2017) (citing *Village of San Jose v. McWilliams*, 284 F.3d 785 (7th Cir. 2002) (placing title to property in

9

others' names and retaining beneficial interest)); *see also Keeney*, 227 F.3d at 682–83.

*Carter-Jones Lumber Co. v. Beatty* (*In re Beatty*), 583 B.R. 128, 136–37 (Bankr. N.D. Ohio 2018); *see also Cooper v. Crocker* (*In re Cooper*), No. 3:17-cv-00569,  2018 WL 1907448, at *2 (M.D. Tenn. Apr. 23, 2018) (quoting *Buckeye Retirement Co., LLC, LTD. v. Swegan* (*In re Swegan*), 383 B.R. 646, 655 (B.A.P. 6th Cir. 2008)) ("'Concealment' is defined as, 'the withholding of knowledge of an asset by the failure or refusal to divulge information required by law to be made known.'").  "Concealment may also occur when a debtor transfers 'legal title to property to a third party with the retention of a secret interest.'" *McDermott v. Recupero* (*In re Recupero*), No. 13-60322, 2014 WL 1884331, at *7 (Bankr. N.D. Ohio May 12, 2014) (citing *Ohio Citizens Trust Co. v. Smith* (*In re Smith*), 11 B.R. 20, 22 (Bankr. N. D. Ohio 1981) and  *Kaler v. Craig* (*In re Craig*), 195 B.R. 443, 449 (Bankr. D.N.D. 1996)).

**b.  "Transfer"**

Section 101(54) of the Bankruptcy Code defines "transfer."  It provides, in relevant part: "The term 'transfer' means . . . each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with– (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D).  "'Under the broad definition of transfer in 11 U.S.C. § 101(54), even disposition of possession, custody or control could qualify as a transfer.'" *Beatty*, 583 B.R. at 136 (quoting *RES–GA Diamond Meadows, LLC. v. Robertson* (*In re Robertson* ), 576 B.R. 684, 700 (Bankr. N.D. Ga. 2017)).

*Wise*, 590 B.R. at 430.

In addition, the Plaintiff must prove the intent element — that the Debtor intended to "hinder, delay, or defraud a creditor or an officer of the estate charged with custody of" estate property.  11 U.S.C. § 727(a)(2).  As held by this Court in *Wise*,

**c.  The intent element: intent to "hinder" or "delay" is sufficient; intent to "defraud" is also sufficient, but not required.**

10

"[A]ctual, rather than constructive, intent is required on the part of the debtor." *Retz v. Samson* (*In re Retz*), 606 F.3d 1189, 1196 (9th Cir. 2010) (internal quotation marks and citation omitted). "[B]ecause of the inherent difficulties in proving intent, circumstantial evidence, including evidence of the debtor's conduct, may be used to establish his intent." *Ayers v. Babb* (*In re Babb*), 358 B.R. 343, 350 (Bankr. E.D. Tenn. 2006) (citing *Buckeye Retirement Co., L.L.C. v. Heil* (*In re Heil*), 289 B.R. 897, 907 (Bankr. E.D. Tenn. 2003)).

Because the phrase "intent to hinder, delay, or defraud" in § 727(a)(2)(A) is in the disjunctive,

> [a] party objecting to the debtor's discharge under § 727(a)(2)[(A)] need not prove that a debtor intended to hinder, delay, *and* defraud his creditors; proof of any one is sufficient. Thus, for example, if plaintiffs are able to establish a debtor's intent to delay, it is not necessary to prove an intent to defraud.

*McDermott v. Kerr* (*In re Kerr*), No. 15-30531, 2017 WL 3880875, at *14 (Bankr. N.D. Ohio Aug. 30, 2017) (citing *Cuervo v. Snell* (*In re Snell*), 240 B.R. 728, 730 (Bankr. S.D. Ohio 1999) and *Los Alamos Nat'l Bank v. Wreyford* (*In re Wreyford*), 505 B.R. 47, 55 n.6 (Bankr. D.N.M. 2014)). This Court agrees with the many cases that have held that an intent *to defraud* is not necessary under § 727(a)(2)(A); rather, mere intent to hinder or delay is sufficient.

*Wise*, 590 B.R. at 430-31 (citations omitted). The Court's opinion in *Wise* includes a lengthy discussion and cites many cases in support of the foregoing conclusions about the intent element, all of which the Court adopts and reiterates now, and incorporates by reference. *See id.* at 430-35. In summary, § 727(a)(2) "provides three different types of intent [— intent to hinder, intent to delay, intent to defraud —], any one of which will satisfy the intent element of this section." *See id.* at 434.

In *Wise*, the Court described each of the three types of intent under this statute:

11

### d.  The meaning of "intent to hinder" and "intent to delay"

With respect to two of the types of intent — intent to "hinder" and intent to "delay":

> The Bankruptcy Code [also] does not define an intent to "hinder" or an intent to "delay."  According to the Oxford English Dictionary, the term "hinder" means to "keep back, delay; impede; obstruct; prevent."  It defines "delay" as "put off to a later time; postpone, defer." In keeping with this plain meaning, courts have held that a debtor acts with an intent to "hinder" if he or she acts with ". . . an intent to impede or obstruct" creditors and an intent to "delay" if he or she acts with ". . . an intent to slow or postpone creditors."  Others have stated more generally . . . that to act with "intent to hinder or delay" is to "act improperly to make it more difficult for a creditor to collect a debt."

*Wiggains*, 2015 WL 1954438, at *17  (footnotes omitted).

### e.  "Intent to defraud"

As noted earlier in this opinion, "intent to defraud" may be shown by circumstantial evidence.  *See Hobbs v. Rao* (*In re Rao*), 526 B.R. 623, 627 (Bankr. E.D. La. 2015).  Such evidence may include the so-called "badges of fraud."

> In order to determine actual intent, based upon circumstantial evidence, many courts consider the following "badges of fraud":

>> (I) the lack of adequate consideration for the transfer; (ii) the family, friendship, or close relationship between the parties; (iii) the retention of possession, benefit, or use of the property in question by the debtor; (iv) the financial condition of the party sought to be charged prior to and after the transaction in question; (v) the conveyance of all of the

12

debtor's property; (vi) the secrecy of
the conveyance; (vii) the existence or
cumulative effect of a pattern or
series of transactions or course of
conduct after incurring of debt, onset
of financial difficulties, or pendency
or threat of suit by creditors; and
(viii) the general chronology of
events and transactions under inquiry.

[*E. Diversified Distrib., Inc. v. Matus* (*In re*
*Matus*[)], 303 B.R. [660,] 672-73 [(Bankr. N.D. Ga.
2004)]; *see also Stevenson v. Cutler* (*In re Cutler*),
291 B.R. 718, 723 (Bankr. E.D. Mich. 2003);
*Nashville City Bank & Trust Co. v. Peery* (*In re*
*Peery*), 40 B.R. 811, 815 (Bankr. M.D. Tenn. 1984).
Additional factors indicating a debtor's actual intent
include

whether the transaction is conducted
at arm's length; whether the debtor is
aware of the existence of a significant
judgment or over-due debt; whether a
creditor is in hot pursuit of its
judgment or claim and whether the
debtor knows this; and the timing of
the transfer relative to the filing of
the petition.

*Adamson v. Bernier* (*In re Bernier*), 282 B.R. 773,
781 (Bankr. D. Del. 2002). If the plaintiff establishes
the existence of badges of fraud, the burden shifts to
the debtor to rebut the presumption. *Village of San
Jose v. McWilliams*, 284 F.3d 785, 791 (7th
Cir.2002); *see also Peery*, 40 B.R. at 815 n. 6.
Moreover, "[j]ust one wrongful act may be sufficient
to show actual intent . . . [although] a continuing
pattern of wrongful behavior is a stronger indication
[thereof]." [*Hunter v. Sowers* (*In re*] *Sowers*[)], 229
B.R. [151,] 157 [(Bankr. N.D. Ohio 1998)].

*Gordon v. Courtney* (*In re Courtney*), 351 B.R. 491, 500 (Bankr.
E.D. Tenn. 2006).

13

*Wise*, 590 B.R. at 435-36.

## 2. Bankruptcy Code § 727(a)(4)(A)

Section 727(a)(4)(A) of the Bankruptcy Code states:

> (a) The court shall grant the debtor a discharge, unless–
>
> (4)  the debtor knowingly and fraudulently, in or in connection with the case--
>
> > (A) made a false oath or account[.]

11 U.S.C. § 727(a)(4)(A).  In *Wise*, the Court discussed in detail the elements of a "false oath"

claim under this section:

> The United States Court of Appeals for the Sixth Circuit has specified the elements that the Plaintiff must prove, by a preponderance of the evidence under § 727(a)(4)(A).  In *Keeney*, the court stated:
>
> > In order to deny a debtor discharge under this section, a plaintiff must prove by a preponderance of the evidence that: 1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case.
>
> 227 F.3d at 685 (citations omitted).
>
> With respect to the first element noted above, that the statement was made under oath, statements made under penalty of perjury, such as [the debtor's] statements in her bankruptcy schedules and SOFA, are considered to be under oath for purposes of § 727(a)(4)(A).  *See Lim v. Storozhenko* (*In re Storozhenko*), 487 B.R. 457, 466 (Bankr. E.D. Mich. 2012) (citing *Keeney*, 227 F.3d at 686 and 28 U.S.C. § 1746).
>
> As for the fifth of these elements, materiality:
>
> > The subject of a false oath is material if it "'bears a

14

> relationship to the bankrupt's business transactions
> or estate, or concerns the discovery of assets,
> business dealings, or the existence and disposition of
> his property.'"

*Keeney*, 227 F.3d at 686 (citations omitted).

As for the fourth of the *Keeney* elements, *i.e.*, the fraudulent intent
element:

> "'Complete financial disclosure'" is a prerequisite to
> the privilege of discharge. . . . [I]ntent to defraud
> "involves a material representation that you know to
> be false, or, what amounts to the same thing, an
> omission that you know will create an erroneous
> impression." A reckless disregard as to whether a
> representation is true will also satisfy the intent
> requirement. "'[C]ourts may deduce fraudulent
> intent from all the facts and circumstances of a
> case." However, a debtor is entitled to discharge if
> false information is the result of mistake or
> inadvertence.

*Id.* at 685-86 (citations omitted).

This Court reiterates what it said about the fraudulent intent
element, in the case of *Becker v. McInerney* (*In re McInerney*), 509
B.R. 109, 114-16 (Bankr. E.D. Mich. 2014):

> [N]ot caring whether some
> representation is true or false—the
> state of mind known as "reckless
> disregard"—is, at least for purposes
> of the provisions of the Bankruptcy
> Code governing discharge, the
> equivalent of knowing that the
> representation is false and material.

> *In re Chavin*, 150 F.3d 726, 728 (7th Cir.
> 1998)(citations omitted)
> . . .

In a recent bench opinion in *McDermott v. Schwenck*

15

*(In re Schwenck)*, this Court interpreted *Keeney* as requiring the Court to employ a "totality of circumstances" test to determine whether the "fraudulent intent" element of § 727(a)(4)(A) has been satisfied. (*See* Docket # 30 in Adv. Pro. No. 13-4701 (Tr. of Opinion on Trustee's Mot. for Summ. J.) at 14-17.) Under that test, a finding that a debtor had a "reckless disregard as to whether a representation is true," does not, standing alone, *require* the court to find that the "fraudulent intent requirement" of § 727(a)(4)(A) has been established. Rather, whether a debtor had a "reckless disregard as to whether a representation is true," is one factor among others that a court may consider in determining whether to draw an inference of fraudulent intent on the part of a debtor. *Id.* In other words, the Court *may*, but

> is not required to make a finding of fraudulent intent solely because the plaintiff has shown a reckless disregard by the debtor as to truth, ultimately it's all the facts and circumstance that the Court must consider to determine whether the debtor is guilty of actual fraudulent intent and fraudulent intent under *Keeney* . . . mean[s] actual intent to defraud, such as an actual intent by the debtor to conceal, for example, an asset that the debtor wants to keep . . . for his or herself and not lose to the administration of the bankruptcy case by disclosing it.

(*Id.* at 17.)

This Court interprets *Keeney* and similar cases as permitting, but not requiring, a finding of fraudulent intent if the debtor is guilty of reckless disregard for the truth. "[Fraudulent intent] can be found based on 'the cumulative effect of a series of innocent mistakes which evidence a pattern of reckless and

16

cavalier disregard for the truth.'" [citations omitted].

*Wise*, 590 B.R. at 436-38. *Wise* then discussed the concept of "reckless disregard" for the truth:

> In an analogous context, in *Bullock v. Bankchampaign, N.A.*, 133 S.
> Ct. 1754, 1759 (2013), the United States Supreme Court recently
> held that "defalcation" under 11 U.S.C. § 523(a)(4) must be treated
> similarly to the way "fraud" is treated in that section; that fraud
> requires a showing of "positive fraud, or fraud in fact, involving
> moral turpitude or intentional wrong;" but that an intentional wrong
> includes "not only conduct that the fiduciary knows is improper,
> but also reckless conduct of the kind that the criminal law often
> treats as the equivalent [of an intentional wrong];" and that reckless
> conduct for purposes of § 523(a)(4) is when a "fiduciary
> 'consciously disregards' (or is willfully blind to) 'a substantial and
> unjustifiable risk' that his conduct will turn out to violate a
> fiduciary duty"). *See also Shapiro v. Plante & Moran, LLP* (*In re
> Connolly North America, LLC*), 376 B.R. 161, 184 (Bankr. E.D.
> Mich. 2007) (citations omitted) (discussing levels of culpability in
> the context of a failure to comply with discovery obligations)
> ("'Reckless disregard' . . . is '[c]haracterized by the creation of a
> substantial and unjustifiable risk of harm to others, and by a
> conscious (and sometimes deliberate) disregard for or indifference
> to that risk.'")

*Wise*, 590 B.R. at 438.

## C. Application of law to the facts of this adversary proceeding

### 1. Denial of discharge based on § 727(a)(2)(A) — the 2018 tax returns

#### a. Transfer and concealment of the Debtors' property

The Trustee argues that the Debtors made pre-petition "transfers" of their property, and "concealed" their property, when they filed their federal and state income tax returns for 2018, containing the Debtors' election to apply their 2018 tax overpayments to their 2019 tax liabilities. The Court agrees. The Debtors' tax elections easily fit within the broad definitions of "transfer" and "conceal" adopted by Bankruptcy Code § 101(54) and the case law, discussed in

17

Part III.B of this Opinion, above.

The Debtors' rights to receive federal and state tax refunds for 2018 clearly were "property" of the Debtors under § 727(a)(2)(A), and the Debtors do not argue otherwise. *See* cases cited in Part III.C.3.a of this Opinion, below. The Debtors made a "transfer" of their rights to receive the federal and state tax refunds, because they disposed of those rights. They did so because in effect they traded those rights in exchange for a credit against the next year's taxes. Put another way, the Debtors used their rights to 2018 tax refunds to make a payment to the two taxing authorities for 2019 taxes. *See, e.g.,* 26 U.S.C. § 6513(d);[21] Mich. Comp. Laws Ann.

---

[21] Section 6513(d) states:

> **(d) Overpayment of income tax credited to estimated tax.**--If any overpayment of income tax is, in accordance with section 6402(b), claimed as a credit against estimated tax for the succeeding taxable year, ***such amount shall be considered as a payment of the income tax for the succeeding taxable year*** (whether or not claimed as a credit in the return of estimated tax for such succeeding taxable year), and no claim for credit or refund of such overpayment shall be allowed for the taxable year in which the overpayment arises.

26 U.S.C. § 6513(d) (bold in original) (italicized bold added).

§ 205.30;[22] Mich. Comp. Laws Ann. § 206.301.[23]

Case law on this subject, cited by the Trustee,[24] supports the Court's conclusion that the

Debtors made a "transfer," and the Debtors have cited no case law to the contrary. *See United*

---

[22]     Mich. Comp. Laws Ann. § 205.30 states, in relevant part:

(1) The [Michigan Department of Treasury] shall credit or refund an overpayment of taxes; . . .

(2) . . . **If a tax return reflects an overpayment or credits in excess of the tax, the declaration of that fact on the return constitutes a claim for refund**. If the department agrees the claim is valid, **the amount of overpayment**, penalties, and interest **shall be first applied to any known liability** as provided in section 30a, **and the excess, if any**, **shall be refunded to the taxpayer or credited at the taxpayer's request, against any current or subsequent tax liability**. . . .

*Id.* (emphasis added) (footnote omitted).

[23]  Mich. Comp. Laws Ann. § 206.301 requires certain taxpayers to make estimated income tax payments.  Such payments must be made on a quarterly basis, or, in the alternative, in one annual lump sum.  The annual lump sum must be paid when the taxpayer files their annual tax return for the prior year.  This section states, in relevant part:

Sec. 301. (1) Every person on a calendar year basis, if the person's annual tax can reasonably be expected to exceed the amount withheld under section 351 and the credits allowed under this part by more than $500.00, **shall pay to the department installments of estimated tax** under this part on or before April 15, June 15, and September 15 of the person's tax year and January 15 in the following year. Subject to subsection (3), each installment shall be equal to ¼ the taxpayer's estimated tax under this part after first deducting the amount estimated to be withheld under section 351.
. . . .

(5) **Instead of quarterly payments, a person subject to this section may pay an estimated annual tax for the succeeding tax year. The payment shall be made at the same time the person files the annual return for the previous full tax year**.

*Id.* (emphasis added) (footnote omitted).

[24]  The Trustee cited these cases in his trial brief (Docket # 99) at pdf pp. 6-8.

19

*States v. Sims* (*In re Feiler*), 218 F.3d 948, 955, 956 (9th Cir. 2000) (bankruptcy debtors' pre-petition tax election to carry forward net operating loss ("NOL") to offset future income, and to waive NOL carryback and resulting tax refund, was a "transfer" of a property interest to the IRS); *Gibson v. United States* (*In re Russell*), 927 F.2d 413, 418 (8th Cir. 1991) (same, regarding bankruptcy debtor's post-petition NOL election); *Kapila v. United States* (*In re Taylor*), 386 B.R. 361, 369 (Bankr. S.D. Fla. 2008) (same, regarding bankruptcy debtor's pre-petition NOL election).

The Debtors also "concealed" their rights to the 2018 tax refunds, because the Debtors placed their 2018 tax refunds beyond the reach of their creditors, other than the tax creditors. As noted above, concealment "includes . . . 'conduct, such as placing assets beyond the reach of creditors . . . .'" *Wise*, 590 B.R. at 430 (citations omitted); *see, e.g.*, *McDermott v. Recupero* (*In re Recupero*), No. 13-6089, 2014 WL 1884331, at *7 (Bankr. N.D. Ohio May 12, 2014) (bankruptcy debtors' pre-petition deposit of personal earnings into a corporate bank account was both a "transfer" and a "concealment" of the debtors' property under § 727(a)(2)(A)).

**b.  The intent element**

The Trustee's objection to discharge under § 727(a)(2)(A) fails, however, because the Trustee did not meet his burden of proving that the Debtors' 2018 tax refund transfers were made "with intent to hinder, delay, or defraud" a creditor or the Trustee. To the contrary, the Court finds that the Debtors did *not* make the transfers with such intent.

There was no such intent with respect to the Trustee, nor does the Trustee contend that there was. There was no Chapter 7 Trustee in place as of March 31, 2020. The Debtors' bankruptcy case was not yet pending, and would not be pending until almost five months later.

20

There is no evidence that in March 2020 the Debtors intended to hinder, delay, or defraud a future Chapter 7 trustee, in a future bankruptcy case.

And there was no such intent with respect to any creditor. The evidence persuades the Court that the Debtors' 2018 tax refund transfers were made with the sole intent of trying to insure that there would be enough money for the Debtors to pay their *2019* federal and state income taxes, to the Internal Revenue Service and the State of Michigan. Such intent *does* amount to an intent to give preferential treatment to those two taxing authorities, which were creditors of the Debtors, compared to the treatment of other creditors. But as a matter of law, a debtor's mere intent to prefer one creditor over other creditors cannot be deemed an intent "to hinder, delay, or defraud" a creditor or creditors, within the meaning of § 727(a)(2)(A). *See ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 390, 391 (S.D. Texas 2008) (citations omitted) ("[A]n intent to prefer one creditor over others is not, standing alone, enough to prove that the debtor had the intent to hinder, delay, or defraud any creditors."); *Adamson v. Bernier* (*In re Bernier*), 282 B.R. 773, 781 (Bankr. D. Del. 2002) (citing *Equitable Bank v. Miller* (*In re Miller*), 39 F.3d 301, 307 (11th Cir. 1994) and 6 Collier on Bankruptcy ¶ 727.02[3][c] (15th ed. rev. 2000) ("The debtor's intent to prefer one bona fide creditor over another is not equivalent to intent to hinder, delay, or defraud creditors" under § 727(a)(2)(A).); *Kane v. Chu* (*In re Chu*), 511 B.R. 681, 685 (Bankr. D. Haw. 2014) (denying a trustee's summary judgment motion against the debtor under § 727(a)(2)(A), based on debtor's testimony that she made transfers with intent of making sure that "some favored creditors got paid.").

Construing the § 727(a)(2)(A) intent element in this way is consistent with the requirement that the § 727(a) grounds for denying discharge be "narrowly construed in

furtherance of the Bankruptcy Code's fresh start policy.'" *Wise*, 590 B.R. at 429 (citations omitted) (quoted in Part III.B of this Opinion). If in making a pre-petition transfer, a debtor's mere intent to prefer one creditor over others were sufficient to deny discharge, that could subject most or all debtors who merely made a pre-petition preferential transfer under 11 U.S.C. § 547 to a denial of their discharge. Section 727(a)(2)(A) cannot be construed so broadly.

The evidence supports the Court's finding that in making their 2018 tax refund transfers, the Debtors merely intended to prefer their tax authority creditors over their other creditors.

It is undisputed that the Debtors began having serious financial problems at least as early as August 2018, some two years before they filed bankruptcy. This was due to the Debtor Jason Wylie suffering multiple and severe health problems, which began in 2014, when Jason had a seizure and underwent surgery to remove a brain tumor.[25] Jason had more surgery in 2017, once again to remove a brain tumor, and in 2018 had intestinal surgery. For his brain cancer he had a year of chemotherapy and 42 rounds of radiation therapy. By August 2018, Jason could no longer work due to his continuing health problems.[26] And he had to have colon surgery in 2019.[27]

Jason Wylie's health problems caused a significant decline in the income the Debtors depended on to support themselves and their two teenage children. Before his health problems began, Jason Wylie worked full time as an engineer for General Motors, and earned additional

---

[25] Tr. (Docket # 122) at 78 (Jason Wylie testimony). The Court will cite Jason Wylie's trial testimony (transcript at Docket # 122) as "Jason Wylie testimony at __."

[26] *See* Jason Wylie testimony at 77-79; Tr. (Docket # 123) at 25-26 (Leah Wylie testimony). The Court will cite Leah Wylie's trial testimony (transcript at Docket # 123) as "Leah Wylie testimony at __."

[27] *See* Jason Wylie testimony at 109.

22

income from farming. He also owned and ran two small businesses — Wylie's Rental and Excavating and Bliz Properties. Wylie's Rental and Excavating rented out construction equipment and did excavating work, and eventually evolved into a farming operation.[28] Bliz Properties acquired farmland from Jason's relatives, with family financing, and rental homes.[29] Jason also acquired farmland from his relatives personally, again with family financing.[30] The Debtor Leah Wylie worked for a landscaping company.

In his farming work and businesses, Jason had a significant amount of farm machinery and equipment and vehicles, which had been financed with secured lenders. And Wylie's Rental and Excavating had 52 pieces of equipment listed on a depreciation schedule, most of which had been financed.[31]

On August 10, 2018, Jason had to stop working for General Motors.[32] By the fall of 2018, Jason also had to stop operating his farming business, Wylie's Rental and Excavating, Inc.[33] And he was unable to harvest his own crops (corns and beans) in 2018; he had to pay two other farmers to do so, in what turned out to be his last harvest. This caused the Debtors a big financial loss.[34] These events left the Debtors with "very little, if any, cash coming in" and bills

---

[28] *Id.* at 71-72, 79-80.

[29] *See id.* at 73-75.

[30] *See id.* at 74.

[31] *See id.* at 77.

[32] *See id.* at 5.

[33] *See id.* at 5-6, 71-72.

[34] *Id.* at 6, 83.

to pay.[35]  Beginning in 2018 and carrying over into 2019, several vehicles and all of the

machinery and equipment had to be surrendered to, and were repossessed by, the Debtors'

secured creditors.[36]  And in 2019, Jason surrendered to his relatives several parcels of real estate

that he had acquired from them.[37]

The Debtors stopped making payments on their several credit cards after September and

October 2018.[38]  The Debtors were able to pay to settle with only one of their credit card

creditors.[39]

In addition to cooperating with the surrender/repossession of the vehicles, machinery,

and equipment, the Debtors voluntarily used $70,000.00 of the proceeds from their 2018 crop

harvest to partially pay an unsecured creditor, Napoleon Feed Mill.[40]

The Debtors were sued by several of their creditors.[41]  According to their Statement of

Financial Affairs, during the one year preceding their bankruptcy filing, the Debtors were parties

to at least four collection lawsuits filed by creditors, as well as repossessions and numerous

---

[35]  *Id.*

[36]  *See id.* at 22-23 (2018 Chevrolet Silverado surrendered and sold by creditor; Skidoo repossessed by creditor and sold; 2017 Chevrolet Silverado surrendered and sold by creditor); Leah Wylie testimony at 27-29 (surrender and repossession of all the farm equipment; snowmobiles; two pickup trucks).

[37]  *See* Jason Wylie testimony at 76; Leah Wylie testimony at 33-34.

[38]  *See* Leah Wylie testimony at 10.

[39]  *See id.* at 35.

[40]  *See id.*

[41]  *See* Jason Wylie testimony at 106.

garnishments by creditors.[42]

Against this backdrop of financial distress, the Debtors had to worry about their federal and state income taxes for 2018 and 2019.  For many years, the Debtors had employed a tax accountant for tax preparation and advice, Steven Eshelman, who is a tax accountant with Greenstone Farm Credit Services.  Mr. Eshelman had prepared the Debtors' income tax returns for the last 20-25 years.[43]  As of September 2019, the Debtors had not yet prepared or filed their 2018 income tax returns, and had not yet determined what the amount of their 2018 tax liabilities were.  Mr. Eshelman did not even start working on preparing the Debtors' 2018 tax returns until November 2019.[44]  The 2018 tax returns were not timely filed because of Jason's health problems, and because Leah Wylie "was having difficulty getting everything around and ready for the tax preparation, dealing with everything else so everything was just delayed."[45]

In September 2019, the Debtors were concerned that they might have a significant tax liability for 2018, due, in part at least, to the fact that depreciated machinery and equipment had been surrendered to creditors and sold.[46]  Mr. Eshelman advised the Debtors of this at the time.[47]  At Mr. Eshelman's suggestion, in September 2019, the Debtors made estimated income tax

---

[42]  *See* PX-27 at pdf pp. 57-59 (Statement of Financial Affairs at item nos. 9, 10).

[43]  Tr. (Docket # 117) at 4-5 (Steve Eshelman testimony).  The Court will cite Mr. Eshelman's trial testimony (transcript at Docket # 117) as "Eshelman at __."

[44]  *See* Eshelman at 57.

[45]  *Id.*

[46]  *See id.* at 58; *see also id.* at 78 (repossessions give rise to tax liabilities, potentially); Jason Wylie testimony at 84-85; Leah Wylie testimony at 39.

[47]  *See* Eshelman at 70-72.

25

payments for 2018, of $10,000.00 to the Internal Revenue Service and of $3,000.00 to the State of Michigan.[48]  According to Mr. Eshelman, these amounts were "mainly a shot in the dark," because he "had no figures to go by at that point as far as what [the 2018 tax liability] would be."[49]

By December 18, 2018, with their financial problems continuing, the Debtors retained their current bankruptcy attorney for advice and possibly for filing bankruptcy.[50]

By late March 2020, Mr. Eshelman had completed preparation of the Debtors' 2018 state and federal income tax returns.  The tax returns were complicated[51] and lengthy,[52] for a number of reasons, including the nature and number of income sources the Debtors had in 2018 and the repossessions and sales of depreciated assets that had occurred in 2018.  As noted earlier, the returns showed that the Debtors had overpaid their 2018 federal income tax by $21,317.00, and had overpaid their 2018 Michigan income tax by $17,956.00.

Despite these overpayments for 2018, the Debtors and Mr. Eshelman were concerned that the Debtors might have significant income tax liabilities for 2019, in part because there had been more sales that year than in 2018 of depreciated machinery and equipment.  As of March 2020 Mr. Eshelman did not know how large the Debtors' 2019 income tax liability might turn out to be.  It would be several months later before Mr. Eshelman was able to complete the preparation

---

[48]  *See* Eshelman at 15, 16; Leah Wylie testimony at 39.

[49]  Eshelman at 72.

[50]  *See* Jason Wylie testimony at 8-9; DX-B at pdf p. 9 ¶ 25.

[51]  Eshelman at 64.

[52]  The Debtors' 2018 federal income tax return was 48 pages long, and their 2018 Michigan income tax return was 13 pages long. (*See* DX-D at pdf pp. 5-52; DX-D at pdf pp. 53-65).

26

of the Debtors' 2019 tax returns.[53]

Mr. Eshelman explained why determining the tax liability on the Debtors' 2019 tax returns was even more complicated than with the 2018 returns:

> Q. [W]as the 2019 return more complicated than the 2018?
>
> A. Yes.
>
> Q. Why is that?
>
> A. In the 2019 return, there were quite a few assets, either sales or repossessions with equipment. It had depreciation taken on it, so I had to have gain or loss figured on each one of those assets either sold or repossessed. And on real estate, there was land sold or repossessed that, I believe, previously had sold the development rights on, so the basis might've been adjusted because of that.[54]

Faced with this uncertainty, and owing a significant amount of debt to numerous creditors, and knowing that they could not pay all of their creditors in full, and having been sued by some of their creditors, the Debtors wanted to try to make sure they could pay their 2019 income taxes. In order to try to insure that, the Debtors elected to apply their 2018 income tax overpayments to their 2019 tax liabilities, rather than receiving tax refunds for those

---

[53] The 2019 tax returns were prepared during the summer of 2020, in July and August 2020, and went through several drafts. The returns were finalized on August 26, 2020, when Jason Wylie approved them and when the Debtors both signed off on them. (*See* Eshelman at 73, 75, 37-38, PX-8 at pdf. pp. 1, 4-6).

[54] Eshelman at 69. Ultimately, the Debtors' 2019 federal income tax return was 93 pages long, while their 2019 Michigan income tax return was 16 pages long. (*See* DX-E at pdf pp. 10-102; DX-E at pdf pp. 106-121).

Jason Wylie testified that the task of helping prepare the 2019 tax returns "was overwhelming." (Jason Wylie testimony at 108). Leah Wylie testified that the 2019 tax returns were "a lot more complicated" than the 2018 returns, "because a lot of the equipment and items were repossessed. There were 50 things at different time frames with depreciation and gains and it was extremely complicated." (Leah Wylie testimony at 38).

overpayments.  And this is what the Debtors' long-time tax accountant, Mr. Eshelman, advised the Debtors to do.[55]

At the time, if the Debtors had received their $39,273.00 in 2018 tax overpayments as tax refunds, there was a risk that the Debtors would spend the money on living expenses, and possibly on paying other creditors.  There also was an obvious risk, well known to the Debtors' retained bankruptcy attorney advising the Debtors at the time, that creditors other than the tax creditors would try to collect their debts from the tax refund money, including by means of bank garnishments.

To try to prove the intent element of his objection to discharge, the Trustee relies heavily on an email exchange between Mr. Eshelman and Jason Wylie that occurred on the morning of March 31, 2020, just before Mr. Eshelman filed the Debtors' 2018 income tax returns.  The exchange began with an email from Mr. Eshelman to Jason Wylie, stating:

> Jason,
>
> I am done with your 2018 returns. With our offices shut down what I can do is e-mail you a client copy to review.  Each return will have a Form 8879 e-file authorization that is the 2nd or 3rd page printing. **The refunds on each return I credited toward [2019][56] as previously you and Leah mentioned you didn't want it refunded because creditors might go after it.**
>
> I just wanted to give you a heads up that I will e-mail those returns through our mimecast secure software today.  If you and Leah can print the Form 8879 for each return, sign it and scan it in and e-mail it to me or take a picture of it and e-mail it to me I will e-file the returns.

---

[55]  *See* Leah Wylie testimony at 57, 95-97.

[56]  Here the email says "2020," but Mr. Eshelman testified, and the parties agree, that this was a typographical error, and Mr. Eshelman meant to say "2019" here.  *See* Eshelman at 31.

Thanks,

Steve[57]

Jason Wylie responded to this email later that morning, as follows:

Great.

Thanks. I will look for the email[.]

Jason[58]

At first blush, the bolded part of Mr. Eshelman's email may seem like a "smoking gun," showing the Debtors' intent to hinder, delay, or defraud creditors. The Trustee views it as such, especially when combined with Jason Wylie's email response. But in the Court's view, it merely shows the Debtors' intent to give preferential payment treatment to their taxing authority creditors.

The testimony of Mr. Eshelman and the Debtors' testimony fully support this conclusion. Mr. Eshelman admitted that he wrote the March 31, 2020 email to Jason Wylie,[59] and Jason Wylie admits that he "must have" received this email, and that he made the response quoted above.[60] But Mr. Eshelman explained the email this way:

> [The 2018 tax overpayments] were credited to 2019 because [the Debtors] were worried about having a lot of tax to pay, that's when all the equipment and land was sold or repossessed. And they were worried if it was refunded that it might go somewhere else, and it wouldn't be able to be used for taxes.
> . . .

---

[57] PX-6 (emphasis added).

[58] *Id.*

[59] *See* Eshelman at 30-33.

[60] Jason Wylie testimony at 27.

29

[The Debtors] were worried about 2019 taxes because of the sale of the equipment and the property, and they were worried, and they wanted to make sure the taxes were paid.[61]

In March 2020, when the Debtors elected in their tax returns to have their 2018 tax overpayments applied to the Debtors's 2019 tax liabilities, it was certainly plausible that the Debtors believed that they needed to do this in order to make sure that their as-yet undetermined amount of 2019 income taxes would be fully paid. And the Court finds that this is in fact what the Debtors believed.

At the time, Mr. Eshelman discussed with the Debtors the option of them getting their tax refunds, and putting the money in a bank account to be used to pay 2019 taxes later:

> Q. And so, if they were concerned about 2019 taxes, they could have gotten a refund and then put the money in a bank account or put it anywhere they chose, and then later on paid the 2019 tax liability or the tax bill when it came due, isn't that true?
>
> A. Correct.
>
> Q. Do you recall any discussion with them about that option, about getting a refund and then holding on to it?
> . . .
>
> A. Yeah, . . . when the return was done, they wanted it credited towards the . . . 2019 return mainly to make sure that their taxes were paid. They were afraid if it was refunded, the money wouldn't be there to be able . . . to pay taxes for the next year.[62]

When questioned about why the Debtors elected to apply their 2018 tax overpayments to their 2019 taxes, Jason Wylie testified as follows:

> Q. What was the purpose in doing that?

---

[61] Eshelman at 33, 63-64.

[62] *Id.* at 77-78.

30

A.  Just like I stated before, because we had all those repossessions coming up, and if you look at my tax return there's, you know, almost $1 million of equipment all being repossessed, there's gains to be paid, and we didn't know what they would be.  So being safe, [the IRS is][63] like a creditor to me, so you don't want to double-cross IRS, so we were playing it safe by applying it to the '19 tax return.

Q.  Why didn't you just keep the money -- take the refund and keep the money in your bank account and if you had tax liability in 2019 or thereafter pay it with the money in your bank account?

A.  Because sometimes I spend it.

Q.  Is it also possible that creditors could have seized that money if it was in your bank account?

A.  I don't know.

Q.  You owed creditors a lot of money at the time you filed your 2018 tax return, correct?

A.  Yeah.

Q.  I believe that was March 31, 2020, you owed creditors money for at least a year and a half, correct?

A.  Yeah.

Q.  Were you worried that if you got a tax refund and put it in the bank they would seize your money?

A.  I was more worried about paying IRS than I was having my money tax taken out of my account.[64]

---

[63]  At this point in the transcript, the transcriber inserted "(unintelligible)."  *See* Jason Wylie testimony at 26 line 8.  But the Court has listened to the audio recording of the testimony, and there is nothing that is unintelligible at this point.  The Court has inserted the phrase in brackets at this point in the quotation, because that is what the witness said.  That is clearly audible from the audio recording, which is filed at Docket # 103, at the 3:51:53 mark.

[64]  Jason Wylie testimony at 26-27.

Similarly, Leah Wylie testified as follows:

> Q. . . . In regards to your 2018 tax return where you and your husband made an election to apply your tax overpayment to tax year 2019, why did you do that?
>
> A. Because we weren't sure whether we were going to owe taxes. I wanted to make sure our taxes were paid.
>
> Q. When you leave the money with the IRS or state of Michigan, do they pay you any interest?
>
> A. I have no idea.
>
> Q. If you would have received the tax refund you could have kept it in your bank account, correct?
>
> A. Yes. But my husband has brain cancer and over the last few years does not deal with money well in a bank account.
>
> Q. . . . You could have [taken] the tax refund and bought a certificate of deposit and received interest on your money, correct?
>
> A. I don't know what that even is, so I'm not sure.
>
> Q. The truth is, you were worried about creditors seizing your money if you received a tax refund. Isn't that correct?
>
> A. No.
> . . .
>
> A. I was worried that we were not going to have enough to pay our taxes. To me, taxes are part of bills, and if you don't pay your taxes I know the interest rates are extremely high and I wanted to make sure that we paid them. I know that if you get behind on your taxes, it's very hard to catch up. I wanted to make sure that didn't happen.[65]

Elaborating on Jason Wylie's testimony, Leah Wylie explained about her concern that if

they received the 2018 tax refunds, rather than applying them to their 2019 taxes, the refund

---

[65] Leah Wylie testimony at 13-14, 40.

money would be spent and would not be available to pay the 2019 taxes:

> Q. You heard Mr. Wylie testify the other day that he said a concern he would have with the money being in his bank account is that he might spend it?

> A. Exactly. Which was why I had guardianship and conservatorship, and that was granted August 13th, a year ago, so of 2020.

> Q. And prior to that time, were there ever occasions when Jason spent money and you didn't agree with the decision?

> A. Yes. Part of his tumor location, he does not make very good decisions sometimes, and that is a definite scare to have any money in the account, which is why I have guardianship and conservatorship. . . .
> Q. Is it possible that you discussed this concern, your concern over Jason's spending, with Steve Eshelman?

> A. Yes. Absolutely. I remember a conversation.

> Q. You did speak to him about that concern?

> A. Yes.

> Q. And was your discussion with him related to any discussion of the possibility of getting a refund on the 2018 taxes and holding on to it and later using it to pay 2019 taxes?

> A. . . . I know that I didn't want the money sitting in our account in fear for Jason spending it.

> Q. Are you saying you had a conversation with Steve Eshelman about this?

> A. Yes.

> Q. You were concerned that if you got a refund on the 2018 taxes and deposited in your bank account Jason might spend it?

> A. Yes.

Q. Is it possible that when Mr. Eshelman sent the email to Jason saying there was a concern about getting a refund that what he was remembering is your discussion with him that your concern was that Jason might spend the money?

A. I believe so, yes. [66]

Based on the evidence described above, including the testimony of each of the Debtors and of their tax accountant Mr. Eshelman, all of which the Court finds credible, the Court finds that the Debtors' only intent in making their 2018 tax refund elections was to try to make sure that their taxing authority creditors would be paid in full for the 2019 taxes. The Debtors' intent in taking this action was not to hinder, delay, or defraud creditors, but rather merely to prefer the two tax creditors over their other creditors.[67]

For this reason, the Trustee has failed to prove a necessary element of his objection to the Debtors' discharge under § 727(a)(2)(A). That objection fails.

## 2. Denial of discharge based on § 727(a)(4)(A) — the alleged false oaths

As described in Part III.A.1.c of this Opinion, the Trustee alleges that the Debtors made false oaths, in the information they gave and failed to give about tax refunds owed to them, at item no. 28 of the Schedule A/B they filed with their bankruptcy petition. And, the Trustee alleges, the Debtors made a further false oath when they verified the accuracy and completeness

---

[66] *Id.* at 43-45.

[67] In support of the intent element of each of the Trustee's § 727(a) claims, the Trustee argues that several "badges of fraud," and other circumstances, show that the Debtors had fraudulent intent. The circumstances include alleged false statements in the Debtors' Schedule J and Statement of Financial Affairs, and several allegedly fraudulent transfers of real estate made by the Debtor Jason Wylie to his relatives, some of which transfers are the subject of other pending adversary proceedings. In this adversary proceeding, the Court finds it unnecessary to resolve the disputes between the parties about these things. The Court does not find these allegations by the Trustee persuasive or very relevant in this particular case, which concerns only tax refunds.

34

of their Schedule A/B, in their testimony at the first meeting of creditors.

The Court finds that in these instances, the Debtors did make false statements under oath about their tax refunds.  But the Trustee has failed to prove an essential element of his false oath claim under § 727(a)(4)(A), namely, the intent element.  The Trustee failed to prove by a preponderance of the evidence that the Debtors made these false statements "fraudulently," — that is, that the Debtors made the false statements "with fraudulent intent."  *See Wise*, 590 B.R. at 436, quoted in Part III.B.2 of this Opinion (quoting *Keeney v. Smith* (*In re Keeney*), 227 F.3d 679, 685 (6th Cir. 2000)).  To the contrary, the Court finds that the Debtors did *not* make these false statements with any fraudulent intent.

### a.  The Debtors made false statements under oath.

The Debtors filed their Schedule A/B, along with their other schedules, on the same date as their bankruptcy petition, August 27, 2020.  The basic facts about the Debtors' Schedule A/B are described in Part III.A.1.c of this Opinion.  At item 28, the Debtors checked the box "Yes," that tax refunds were owed to them.  The Debtors stated that the value of tax refunds owed to them was "Unknown."[68]  The only other information the Debtors stated about tax refunds was this:

> Payment of $13,000 total, $10,000 to IRS and $3,000 to state of Michigan on October 2, 2019, towards estimated income tax liability.  2019 returns have not been filed.  Payment amount was estimated to equal the tax liability.[69]

The Debtors each signed and filed with their Schedules a declaration under penalty of perjury,

---

[68]  PX-27 at pdf p. 18.

[69]  *Id.*

35

stating that "I have read the summary and schedules filed with this declaration and that they are true and correct."[70]

The Court finds that the following statements in Schedule A/B were false when made: (1) that the value of the tax refunds was "Unknown;" and (2) that the $13,000 in estimated tax payments made on October 2, 2019 (the "Payment amount") "was estimated to equal the tax liability."

It is true that the Debtors did not file their 2019 federal and state income tax returns until September 15, 2020, almost three weeks after filing their petition and Schedule A/B. But the Debtors' 2019 tax returns had been completed by their tax accountant, Steven Eshelman, and the Debtors had received copies of the returns *and* signed off on them, *before* they filed their petition and Schedule A/B. By 1:06 p.m. on August 26, 2020, Jason Wylie had reviewed the 2019 tax returns, and in an email to Mr. Eshelman at that date and time, Jason Wylie approved the returns.[71] This was the day before the Debtors filed their bankruptcy petition and Schedule A/B. Also, on August 28, 2020, Mr. Eshelman received from Jason Wylie the IRS form 8879 for 2019, which both of the Debtors had signed with a printed signature date of August 26, 2020.[72] That form 8879 is entitled "IRS *e-file* Signature Authorization," and that form authorized Mr. Eshelman's firm to electronically sign the Debtors' names to their 2019 federal income tax return, and electronically file that return.[73]

---

[70] *Id.* at pdf p. 54.

[71] *See* PX-8 at pdf pp. 1, 6; Eshelman at 37-38.

[72] *See* PX-8 at pdf pp. 4-6; Eshelman at 39-42.

[73] *See* PX-8 at pdf p. 4.

36

The 2019 income tax returns that Jason Wylie reviewed and approved, and that the Debtors signed off on, all on August 26, 2020, showed the exact amount of the Debtors' federal and state income tax overpayments — namely, $20,798.00 federal and $20,736.00 state, for a total of $41,534.00. So the Debtors *did* know, when they filed their Schedule A/B on August 27, 2020, that they had a right to 2019 tax refunds, in these amounts. And the Debtors both signed their Declaration under penalty of perjury, verifying the truth of their Schedule A/B, on August 27, 2020.[74] On that date, it was false for the Debtors to say that their right to tax refunds was "Unknown."

It was also false for the Debtors to say in their Schedule A/B that the $13,000 in estimated tax payments they made on October 2, 2019 (the "Payment amount") "was estimated to equal the tax liability." As described in Part III.C.1.b of this Opinion, it was at the suggestion of the Debtors' tax accountant, Steven Eshelman, that the Debtors made these estimated income tax payments for 2018, of $10,000.00 to the Internal Revenue Service and of $3,000.00 to the State of Michigan.[75] According to Mr. Eshelman, these amounts were "mainly a shot in the dark," because he "had no figures to go by at that point as far as what [the 2018 tax liability] would be."[76] So it was false for the Debtors to say, in their Schedule A/B, that these estimated tax payments were "estimated to equal the tax liability."

In their trial testimony, neither of the Debtors could explain why their statement at item 28 of their Schedule A/B, about tax refunds, was worded the way it was, but they both admitted

---

[74] *See* PX-27 at pdf p. 54.

[75] *See* Eshelman at 15-16; Leah Wylie testimony at 39.

[76] Eshelman at 72.

that it was inaccurate as of the date they filed Schedule A/B.[77]

The Debtors repeated these false statements about tax refunds under oath, on October 21, 2020, when they each testified at the § 341 first meeting of creditors that their Schedules were "truthful, accurate, and complete."[78]

### b. The Debtors' false oaths were not made with fraudulent intent.

The Court finds that the Debtors' false statements about their tax refunds, described above, were not made with any fraudulent intent. When the Debtors made those statements, they knew, and their attorney certainly knew, that the Debtors' 2018 and 2019 tax returns were going to be provided to the Trustee, promptly. And it was obvious, and the Debtors and their attorney knew, that those tax returns would reveal to the Trustee all of the exact and material details about the Debtors' rights to tax refunds. That persuades the Court that the Debtors could not possibly have intended to deceive or mislead the Trustee about their tax refunds when they made their false statements about them.

Shortly before or shortly after the bankruptcy petition and Schedule A/B were filed, the Debtors provided their bankruptcy attorney with their 2018 tax returns, knowing and intending that their attorney would provide those returns to the Trustee.[79] And the Debtors' attorney did provide those returns to the Trustee, on August 28, 2020, the day after filing Schedule A/B.[80]

---

[77] *See* Jason Wylie testimony at 33; Leah Wylie testimony at 19; *but see* Leah Wylie testimony at 52-54.

[78] *See* Tr. of First Meeting of Creditors (PX-1) at 5-6 (testimony of each of the Debtors); Jason Wylie testimony at 69.

[79] *See* Leah Wylie testimony at 54-55.

[80] This was the testimony of Thomas R. Morris, given on the third day of trial. There is no transcript of this testimony on file, but the Court's audio recording of this day of trial, including attorney

Similarly, soon after the Debtors filed their 2019 income tax returns on September 15, 2020, they gave the returns to their attorney, and sometime before September 30, 2020, their attorney provided those returns to the Trustee.[81]  We know these things, not only from the testimony of Leah Wylie and of her attorney, Thomas Morris, but also from the fact that during the first meeting of creditors on October 21, 2020, the Trustee acknowledged that he had both the 2018 and 2019 federal income tax returns, and he asked the Debtors questions about them.[82]  Moreover, the December 11, 2020 demand letter from the Trustee's attorney to the Debtors' attorney clearly shows that well before that date, the Trustee's attorney had the 2018 and 2019 tax returns.[83]

In addition, the Debtors' attorney certainly knew, before he filed the Debtors' bankruptcy petition and Schedule A/B, that the Debtors would be required to provide the Trustee with their 2018 and 2019 federal and state income tax returns.  It is routine and very common for Chapter 7 trustees in this district to investigate whether debtors are owed any tax refunds.  Trustees

---

Morris's testimony, is filed at Docket # 109.  The Trustee presented no evidence contradicting this.  In his trial testimony on the third day of trial, the Trustee's attorney, Jeffrey Bigelman, testified that he had no personal knowledge of whether or when the Trustee received the Debtors' 2018 tax returns.  (Audio recording at Docket #109).

[81]  *See* Leah Wylie testimony at 55, and citation in footnote 82, and testimony of Thomas Morris, third day of trial (audio recording at Docket # 109).  Thomas Morris testified that the 2019 tax returns were provided to the Trustee prior to September 30, 2020.  The Trustee presented no evidence contradicting this.  Instead, the Trustee's attorney, Jeffrey Bigelman, testified that he did not know when the Trustee received the Debtors' 2019 tax returns.  (Audio recording at Docket #109).  The Trustee himself did not testify at trial.

[82]  *See* PX-1 at 7-9.

[83]  *See* DX-A.  The Trustee's attorney, Jeffrey Bigelman, testified during the Trustee's rebuttal case on the third day of trial that it was not until January 5, 2021 that he learned that the Debtors' 2019 tax returns had been filed post-petition, on September 15, 2020.  (Audio recording at Docket # 109).

routinely demand copies of debtors' tax returns. And in this case, 11 U.S.C. § 521(e)(2)(A)(i)

required the Debtors to provide the Trustee, and any requesting creditor, with a copy of their

2018 federal income tax return, no later than 7 days before the first meeting of creditors.[84] That

return showed the large federal tax refund that the Debtors had credited against their 2019

federal taxes. That return alone would certainly cause the Trustee to investigate the Debtors' tax

refunds further, and to demand copies of all of the Debtors' 2018 and 2019 federal and state

income tax returns. And if the Debtors did not voluntarily give the Trustee copies of all the tax

returns, the Trustee easily could have obtained an order compelling the Debtors to do so, under

Fed. R. Bankr. P. 2004.

All of this was very obvious to the Debtors' attorney, who is an experienced and

knowledgeable bankruptcy attorney, before the bankruptcy case was filed.

For all of these reasons, the Court finds that the Debtors could not possibly have

intended, and did not intend, to defraud or deceive the Trustee or anyone else, in making their

---

[84] This section states:

> The debtor shall provide—
>
> (i) not later than 7 days before the date first set for the first meeting of creditors, to the trustee a copy of the Federal income tax return required under applicable law (or at the election of the debtor, a transcript of such return) for the most recent tax year ending immediately before the commencement of the case and for which a Federal income tax return was filed; and
>
> (ii) at the same time the debtor complies with clause (i), a copy of such return (or if elected under clause (i), such transcript) to any creditor that timely requests such copy.

11 U.S.C. § 521(e)(2)(A). If the debtor fails to comply with these requirements, the Court "shall dismiss the case unless the debtor demonstrates that the failure to so comply is due to circumstances beyond the control of the debtor." 11 U.S.C. § 521(e)(2)(B).

false statements about tax refunds. The Trustee has failed to meet his burden of proving the fraudulent intent element of the Trustee's false oaths claim under § 727(a)(4)(A), so that objection to discharge fails.

### 3. Denial of discharge based on § 727(a)(2)(B) — the 2019 tax returns

### a. Transfers of property of the bankruptcy estate

The Trustee argues that the Debtors made post-petition "transfers" of property of the bankruptcy estate, when they filed their federal and state income tax returns for 2019, containing the Debtors' election to apply their 2019 tax overpayments to their 2020 tax liabilities. The Court agrees. The Debtors' tax elections were transfers they made on September 15, 2020, almost three weeks after filing their bankruptcy petition, so the transfers were transfers of property of the bankruptcy estate. These tax refund elections, like the Debtors' pre-petition 2018 tax refund transfers, easily fit within the broad definitions of "transfer" adopted by Bankruptcy Code § 101(54) and the case law, discussed in Parts III.B and III.C.1.a of this Opinion, above.

The Debtors' rights to receive federal and state tax refunds for 2019 clearly was "property" of the Debtors under § 727(a)(2)(A), and therefore became property of the bankruptcy estate the moment the Debtors filed their Chapter 7 bankruptcy petition on August 27, 2020. The Debtors do not argue otherwise.

"It is well settled that tax refunds that the debtor is entitled to at the time of filing a bankruptcy petition are the property of the estate." *Dubois v. Guerrero* (*In re Guerrero*), 30 B.R. 463, 465 (N.D. Ind. 1983) (citations omitted); *see also Turshen v. Chapman* (*In re Turshen*), 823 F.2d 836, 838 (4th Cir. 1987) (citations omitted) (debtor's right to income tax refunds "constituted property of the bankruptcy estate, title to which vested in the estate upon the filing

41

of [the debtor's] Chapter 7 petition." ); *In re Lange*, 110 B.R. 907, 908-09 (Bankr. D. Minn. 1990) (Chapter 7 debtor had no right to file income tax returns post-petition that elected to apply tax refunds to future tax year liabilities, because the tax refund rights were entirely property of the bankruptcy estate); *Gibson v. United States*, 927 F.2d at 417-18 (bankruptcy debtor's post-petition tax election, to carry forward net operating loss ("NOL") to offset future income and to waive NOL carryback and resulting tax refund, was a post-petition transfer of property of the bankruptcy estate); *United States v. Sims*, 218 F.3d at 955 ("the right to receive a tax refund is an interest in property"); *In re Culp*, 641 B.R. 252, 253 (Bankr. E.D. Mich. 2021) (quoting *Aruj v. Kohut* (*In re Araj*), 371 B.R. 240, 243 (Bankr. E.D. Mich. 2007)) (right to tax refunds are property of the bankruptcy estate).

### b. The intent element

The Trustee contends that in making the post-petition tax refund transfers (the "2019 Tax Refund Transfers"), the Debtors made transfers of property of the estate "with intent to hinder, delay, or defraud" the Trustee and/or creditors, so that the Debtors must be denied a discharge under 11 U.S.C. § 727(a)(2)(B). The Court finds that the Trustee met his burden of proving the necessary intent element under this section, by a preponderance of the evidence. The Court finds that the Debtors made the 2019 Tax Refund Transfers with an intent to hinder the Trustee.

Initially, the Court notes that while the issue is the Debtors' intent, rather than the actual effect of the Debtors' action, the 2019 Tax Refund Transfers *potentially* could have had *the effect* of hindering and delaying the Trustee in his efforts to obtain the tax refund proceeds for the bankruptcy estate. Had the Debtors simply elected on their federal and state 2019 tax returns to receive their overpayments as tax refunds, rather than electing to apply the overpayments to

2020 taxes, the taxing authorities would have promptly paid the tax refunds. Instead, they did not pay the refunds until much later, as described below. This had the potential of forcing the Trustee to file adversary proceedings against the taxing authorities, to avoid the 2019 Tax Refund Transfers under 11 U.S.C. § 549(a), as unauthorized post-petition transfers. *See, e.g.*, *Gibson v. United States*, 927 F.2d at 417-18 (discussing such a § 549 action by a Chapter 11 trustee). The Trustee would have prevailed in such adversary proceedings, but the need to prosecute such adversary proceedings would have delayed the Trustee in obtaining the tax refunds, and cost the bankruptcy estate additional attorney fees in doing so.

But as it turned out, the Debtors' 2019 Tax Refund Transfers did not *actually* hinder or delay the Trustee in obtaining the tax refunds, for the following reasons.

In this case, it turned out that § 549(a) adversary proceedings were not necessary. This is because the Debtors filed their *2020* income tax returns, sometime between March 26, 2021 and April 5, 2021,[85] and their 2019 tax refunds were still intact, and their refunds for 2020 were actually even higher.[86] And with their 2020 income tax returns, the Debtors elected to receive the tax refunds, rather than try to apply them to 2021 taxes. So the taxing authorities paid the tax refunds, and the Trustee did not have to file § 549(a) avoidance actions.

In this case, another reason contributed to the result that the Trustee was not *actually* hindered or delayed in getting the tax refunds belonging to the bankruptcy estate. The Debtors amended their Schedule C claims of exemption on January 21, 2021, to claim that the tax

---

[85] *See* Eshelman at 54-55; citations in footnote 86 below.

[86] *See* DX-F (2020 income tax returns) at pdf p. 7 (2020 federal income tax refund of $24,863.00); pdf p. 76 (2020 Michigan income tax refund of $26,155.00).

refreshes were entirely exempt.[87]  The Trustee objected.  The Debtors' exemption claims were not frivolous, but they were unsuccessful.  The Court sustained the Trustee's objection to the tax refund exemptions on May 28, 2021, a decision later affirmed by the district court.  *See In re Wylie*, 630 B.R. 68 (Bankr. E.D. Mich. 2021), *aff'd.*, No. 21-cv-11354, 2022 WL 2872240 (E.D. Mich. July 21, 2022).

During the time the Debtors and the Trustee were litigating the claimed exemptions in this Court the Trustee could not obtain the tax refunds, because of the pending exemption claims.

Ultimately, after filing their 2020 tax returns, the Debtors received the tax refunds, in June 2021, and then promptly paid them over to the Trustee on June 22, 2021.[88]

For this fortuitous combination of reasons, although the Trustee *potentially might have been* hindered and delayed by the Debtors' 2019 Tax Refund Transfers, in reality the Trustee was not *actually* hindered or delayed.

But it is the Debtors' *intent* in making their 2019 Tax Refund Transfers that matters.  As noted in Part III.B of this Opinion, under § 727(a)(2) there is no requirement of "proof of harm," or that creditors or the Trustee "must have, in fact, been hindered, delayed or defrauded."  *Wise*, 590 B.R. at 429-30 (quoting *Smiley v. First Nat'l Bank of Belleville* (*In re Smiley*), 864 F.2d 562, 569 (7th Cir. 1989)).

---

[87]  Docket # 40 in Case No. 20-49216.

[88]  *See* Leah Wylie testimony at 55-56, 83, 85.  In the Trustee's Interim Report filed in the main bankruptcy case on April 12, 2022 (Docket # 141 in Case No. 20-49216), the Trustee reported that he received tax refunds totaling $45,174.98 from Leah Wylie, on June 22, 2021.  (*See id.* at pdf pp. 3, 6).  Some of this amount is for the 2020 tax year.  (*See id.* at pdf p. 3 column 1, line 36).

44

The Court finds that the Debtors *did intend* to hinder the Trustee in making their 2019 Tax Refund Transfers. This is shown by the testimony of the Debtors themselves.

Jason Wylie and Leah Wylie both admitted in their trial testimony that the purpose of making their 2019 Tax Refund Transfers was the same kind of purpose they had when they made their 2018 tax refund elections — to try to make sure that their *2020* taxes would be paid.[89] As the Court has discussed in Part III.C.1.b of this Opinion, this purpose is essentially a purpose to prefer the Debtors' two taxing authority creditors (the Internal Revenue Service and the State of Michigan) over their other creditors. That is, the Debtors wanted to insure that their taxing authority creditors were paid in full, for 2020 taxes, in preference to their other creditors, many or most of which could not be paid in full.

In the post-petition context, the Debtors making a transfer of estate property with this purpose is wholly inconsistent with the duties of the Chapter 7 Trustee. This means that in substance, the Debtors had, at a minimum, an intent to *hinder* the Trustee. In the Debtors' Chapter 7 bankruptcy case, the Chapter 7 Trustee would not and could not give the Debtors' intended preferential treatment to these taxing authority creditors for 2020 taxes. This is so for several reasons.

First, because the Debtors filed their bankruptcy case mid-year, on August 27, 2020, only some of their 2020 income tax liabilities even arguably accrued pre-petition, and the rest accrued post-petition. The entire 2020 income tax liability could not be paid by the Trustee in the

---

[89] *See* Jason Wylie testimony at 108; Leah Wylie testimony at 41 lines 12-20, 93-94. Leah Wylie tried somewhat to walk back her testimony about her intent, in testifying that she did not know that there was a box checked on her 2019 tax returns to cause the 2019 overpayments to be applied to 2020 taxes. *See id.* at 92. But the Court finds more persuasive and credible Leah's initial, clear testimony about her intent. *Id.* at 41 lines 12-20.

Chapter 7 case; at a minimum, the post-petition portion of the 2020 taxes could not be deemed an allowed claim in the bankruptcy case, and for that reason could not be paid. At most, only the arguably "pre-petition" part of the 2020 income taxes could be paid by the Trustee in the bankruptcy estate, and even that could be the subject of a legal dispute.

Second, even if all of the Debtors' 2020 income taxes could be considered as a pre-petition allowed claim in the bankruptcy case, no portion of the 2020 income tax liability would be a priority claim under 11 U.S.C. § 507(a). Section 507(a)(8) gives an eighth priority for certain income taxes, for example, but only for such income taxes "for a taxable year ending on or before the date of filing the petition." 11 U.S.C. § 507(a)(8)(A). That means the Debtors' taxable year of 2019, not 2020. So at most, such taxes could only be paid as non-priority unsecured claims, pro rata with all other such creditors.

Third, in any event, any claim by the taxing authorities for the Debtors' 2020 income taxes would be subordinate to the payment, in full, of all allowed administrative expenses of the Chapter 7 case, under 11 U.S.C. §§ 507(a)(2) and 726(a)(1).

Thus, the Debtors' intent that their 2020 income taxes be paid in full was at war with the priority and distribution scheme of the Bankruptcy Code, and with the Trustee's duty under 11 U.S.C. § 704 to follow that scheme in administering the assets of the bankruptcy estate, including the Debtors' rights to 2019 income tax refunds, which were property of the bankruptcy estate.

The Court assumes that the Debtors were not intimately familiar with the foregoing legal principles about bankruptcy distributions and priorities, although their attorney no doubt was. But the Debtors' actual subjective intent in transferring property of the bankruptcy estate, when

46

they made their 2019 Tax Refund Transfers, still was, in substance, an intent to "hinder" the

Trustee. *See* discussion of "intent to hinder" in Part III.B.1 of this Opinion ("hinder" means

"keep back, delay; impede; obstruct; prevent").

For these reasons, the Court finds that in making the 2019 Tax Refund Transfers, the

Debtors transferred property of the bankruptcy estate with intent to hinder the Trustee. Based on

§ 727(b)(2)(B), therefore, the Court must deny each of the Debtors a discharge. The Court will

enter judgment for the Trustee on this objection to discharge.[90]

## IV. Conclusion

For the reasons stated in this Opinion, the Court will enter a judgment: (1) dismissing,

with prejudice, Counts I and III of the Trustee's First Amended Complaint; (2) granting

judgment for the Trustee on Count II of the First Amended Complaint; and (3) denying each of

the Debtors a discharge under 11 U.S.C. § 727(b)(2)(B).

---

[90] In doing so, the Court rejects an argument made by the Debtors that the Trustee is guilty of unclean hands — "extortion" — for having made a demand in December 2020 that the Debtors pay the Trustee the tax refunds at issue by a deadline of December 18, 2020. In the Trustee's demand letter dated December 11, 2020 (DX-A), the Trustee demanded payment, or a convincing explanation of the Debtors position regarding the tax refunds, and stated that if neither was received, "we will take action on December 18, 2020." The letter did not specify what action would be taken (DX-A at pdf p. 2). But the Trustee's attorney, Jeffrey Bigelman, testified that at the time of this letter, the Trustee contemplated possibly filing a turnover motion, or an adversary proceeding to avoid the 2019 Tax Refund Transfer as a fraudulent transfer. According to Bigelman, after later learning on January 5, 2021 that the Debtors filed their 2019 tax returns post-petition rather than pre-petition, the Trustee decided to file this § 727 action, which the Trustee filed on January 14, 2021. But the Debtors' attorney Thomas Morris testified that in a phone call preceding the letter of December 11, 2020, the Trustee's attorney threatened to file objections to discharge under § 727(a) if the tax refunds were not paid to the Trustee.

The Court finds it unnecessary to decide any possible factual disputes about the Debtors' unclean hands/extortion argument, because even under the Debtors' view of events, the alleged threat of a § 727 action was not "extortion," nor was it conduct that would make the Trustee guilty of having "unclean hands." And the Debtors have cited no authority that such an unclean hands type defense can ever be a valid defense to an objection to discharge under Bankruptcy Code § 727.

**Signed on April 17, 2023**



/s/ Thomas J. Tucker
_____

**Thomas J. Tucker**
**United States Bankruptcy Judge**